## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| THE LINCOLN ELECTRIC COMPANY, 22801 ST. CLAIR AVENUE CLEVELAND, OHIO, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| | ) CASE NO. |
| MERCER COMPANY, 200 SHARON WAY, SHARON, PENNSYLVANIA 16146 | ) JUDGE: ) ) |
| and | ) ) |
| DAVID P. MILLER, 15195 HERITAGE LANE CHAGRIN FALLS, OHIO 44022 | ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff The Lincoln Electric Company on behalf of themselves and a class of Northeast Ohio scrap metal sellers certified in *In re: Scrap Metal Antitrust Litigation*, Case No. 1:02CV0844 (the "*Scrap Metal* case") bring this Complaint against defendants Mercer Company ("Mercer"), and David P. Miller ("Miller"), and in support allege as follows:

## NATURE OF THIS ACTION

1.     This is an antitrust action arising out of a conspiracy (the "Scrap Metal Conspiracy") involving defendant David Miller and his co-conspirators with the purpose and effect of fixing prices, allocating market share, and committing other unlawful practices designed to artificially reduce the prices of ferrous scrap metal ("scrap metal" or "scrap") purchased from

Plaintiff and other scrap producers.  Plaintiff, on behalf of itself and the class described below, brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

2.      This is also an action to enforce in full a judgment for $23,036,000.00.  The judgment results from a federal jury verdict finding that Columbia Iron & Metal Company ("CIMCO") violated Section One of the Sherman Act by conspiring to restrain competition in the purchase of industrial scrap metal.  Following the verdict, defendant Miller, aided and advised by others, sought to fraudulently evade the judgment.  While CIMCO's lawyers unsuccessfully appealed the unanimous verdict all the way to the United States Supreme Court, Miller and his subordinates never intended to respect an adverse result.  Miller directed the unlawful shifting of assets and opportunities from CIMCO to defendant Mercer and other corporations so as to attempt to make the CIMCO judgment uncollectible.  By this action, Class Plaintiff seeks to hold Miller and Mercer, and CIMCO responsible for their unlawful efforts to evade a judgment of a United States court.

3.      Class Plaintiff also seeks to hold Miller personally responsible for his role in the unlawful antitrust conspiracy and his own efforts fraudulently to conceal the conspiracy.

## JURISDICTION AND VENUE

4.      This Court has subject jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367(a), 15 U.S.C. §§ 15, 22 and 26, 28 U.S.C. § 1337(a), and Rule 69 of the Federal Rules of Civil Procedure.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. §§ 15, 22 and 26, because the formation of the conspiracy and the acts in furtherance of the conspiracy took place in substantial part in this District, because the

unlawful acts to evade the execution of the judgment took place in this District, and because defendants are found, do business or transact business within this District.

## THE PARTIES

6.      Plaintiff The Lincoln Electric Company ("Lincoln Electric") is an Ohio corporation with its principal place of business at 22801 St. Clair Avenue, Cleveland, Ohio. Lincoln Electric is a leading manufacturer of welding and cutting equipment that is sold in interstate and foreign commerce.  As a result of the Scrap Metal Conspiracy, Lincoln Electric has been economically injured in that it has sold scrap metal at artificially low and anticompetitive levels to one or more Defendants during the class period.

7.      Mercer Company is an Ohio corporation, with its principal place of business at 200 Stewart Way, Sharon, Pennsylvania.  Mercer is, or was at all pertinent times, controlled by David Miller and Fred B. Knox.  Mercer is a subsidiary or operating division of Universal Steel. Mercer operates in Ohio, as well as in Pennsylvania.

8.      David P. Miller is President of Columbia National Group, Inc. ("Columbia National"); Miller was President of Columbia National's predecessor, DPM Industries.  Miller is President and Assistant Secretary of CIMCO.  Miller is President of Universal Steel.  Miller is President of CR Construction.  Miller is President of Universal Pennsylvania.  Miller is, or was at all pertinent times, President of Mercer.  Miller was the owner and Chief Executive Officer of Atlas-Lederer, Inc. ("Atlas-Lederer"), a subsidiary of Columbia National.

## The Scrap Metal Conspiracy

9.      From a date unknown, but at least from December 1992 and continuing through March 2000, David P. Miller combined, conspired, and agreed with other scrap metal dealers to restrain interstate trade and commerce in Northern Ohio and the United States, in violation of 15 U.S.C. § 1.

3

10.     During all relevant time periods, David P. Miller was the owner and President of Columbia National and was the owner, through Columbia National, and President of CIMCO, a scrap metal trading company.  Between 1992 and 1999, Miller was the owner and CEO of Atlas-Lederer, a scrap metal dealer.

11.     Miller's co-conspirators included, among others, Bluestar Metal Recycling Co. ("Bluestar"), Bay Metal, Inc. ("Bay Metal"), Harry Rock & Associates, Inc. ("Harry Rock"), M. Weingold & Co., Inc. ("Weingold"), Jack Weingold, Loren Margolis, and Parkwood Iron & Metal, Inc. ("Parkwood").

12.     The purchase and resale of scrap metal is a multi-million-dollar a year industry. The Scrap Metal Conspiracy has affected millions of dollars of interstate commerce.

13.     During the relevant time period, the conduct of Miller and his co-conspirators has taken place in and affected the interstate and foreign trade and commerce of the United States.

14.     The conduct of Miller and his co-conspirators has directly, substantially and foreseeably restrained such trade and commerce.  The scrap metal purchased by Miller and his co-conspirators was and is sold in interstate commerce.  The Scrap Metal Conspiracy has inflicted antitrust injury on Plaintiff and other members of the class engaged in interstate commerce.

15.     Various manufacturing processes of products with metal components generate ferrous scrap metal.  This scrap metal has value.  It can be resold to mills and foundries which recycle the scrap into new metal products.

16.     During the relevant time period, Miller and his co-conspirators operated businesses that bought the residual scrap from industrial and other customers and resold it to mills, foundries, and other buyers in Ohio and other states.  For industrial customers, the conspirators generally bid on contracts to purchase scrap for a given period of time at a specified

4

variance to the pricing for scrap set forth in publications such as *Iron Age* magazine. If awarded the contract, the conspirators generally left collection boxes at the manufacturer's site. The scrap was deposited in the collection boxes, picked up, weighed, and then was resold by conspirators to mills and foundries.

17.     During the relevant time period, Miller and his co-conspirators purchased and resold industrial scrap in or affecting interstate commerce, in that they purchased scrap from companies engaged in the sale of goods in interstate and foreign commerce and/or purchased industrial scrap from manufacturers and resold it in interstate commerce.

18.     David Miller's specific unlawful and conspiratorial anticompetitive conduct includes, among many others:

> (a)     Miller had an understanding and agreement with Parkwood that Atlas-Lederer would not call on the accounts of Parkwood as long as the scrap metal that Parkwood generated, virtually all of it came to CIMCO.

> (b)     Miller told Ron Bone, the President and COO of Atlas-Lederer, of complaints from Weingold about competition, and in response Miller instructed Bone not to compete;

> (c)     After talking to Bone, Miller made the decision to stop competing with Weingold and Harry Rock and instructed Bone not to compete for their customers;

> (d)     Miller entered specific agreements not to compete with Weingold and Harry Rock while they discussed a joint venture at the end of 1995, and beginning of 1996;

5

(e)     Miller's vice president at Atlas-Lederer was told by Miller that he had an "understanding" with all of his competitors not to compete for the purchase of scrap metal;

(f)     Miller and others working at his direction instructed employees at Atlas-Lederer not to go after competitor's accounts;

(g)     In 1993, Miller directed Atlas-Lederer employees not to compete for a certain account because the account "belonged" to another scrap dealer;

(h)     At the end of 1994, Miller told his employees of a complaint from Weingold about competition and told his employees to "back off" competing with Weingold and Harry Rock;

(i)     In December 1994, Miller instructed his employees to retract a bid in order to allow Weingold to retain the contract. In exchange for Miller's withdrawal, Weingold agreed to sell Miller's trading company, CIMCO, a certain volume of scrap;

(j)     In December 1995, Miller reported another complaint from Weingold about competition and directed his COO, Ron Bone, to set up a meeting with Harry Rock and Weingold to divide accounts;

(k)     In 1999, Miller agreed with Weingold and Harry Rock that he would exit the scrap dealing business in exchange for the sale of scrap to his trading company, CIMCO. The contract for the sale of Miller's company Atlas-Lederer to Weingold kept the identity of the new owners secret from the market to create a misleading appearance of competition.

19.     Miller and his co-conspirators undertook numerous acts in furtherance of their unlawful conspiracy during the relevant time period. For example, the conspirators:

6

(a)     Participated in meetings and conversations to allocate customers and rig bids for the purchase of ferrous scrap metal;

(b)     Participated in meetings and conversations to set pricing for the purchase of scrap metal and then exchanged documents establishing the agreed-to pricing for certain accounts;

(c)     Engaged in "quid pro quo" arrangements to compensate the pre-arranged losing bidder or companies that agreed to refrain from bidding, e.g., by agreeing to sell the losing bidder specified volumes of scrap at favorable pricing;

(d)     Submitted rigged and collusive bids to Plaintiff and the class members;

(e)     Intimidated other scrap dealers not to offer competitive bids;

(f)     Maintained the illegal conspiracy by directing their own employees not to compete for certain customers;

(g)     Imposed financial penalties on co-conspirators who disobeyed customer allocation agreements and other rules of the conspiracy; and

(h)     Concealed the conspiracy by holding meetings in secret, using false names, using false letterhead, and withholding information from government investigations.

## **Department of Justice Investigation**

20.     A government investigation into the Scrap Metal Conspiracy was initiated in the late 1990s.  That investigation became public in March 2000, when Bay Metal agreed to plead guilty to a charge of participating in an antitrust conspiracy.  The government investigation continued at least through 2009.

21.     A series of government proceedings followed the Bay Metal guilty plea, leading to the convictions of Harry Rock, Howard Bahm, Jack Weingold, M. Weingold, Bluestar, and Loren Margolis for antitrust offenses.

22.     In 2008, the Department of Justice indicted DeMilta Iron and Metal Co. ("DeMilta") and its principals.  The trial against the DeMilta defendants was held in 2009.

23.     At the DeMilta trial, Jack Weingold and Loren Margolis testified for the first time about David Miller's participation in the conspiracy.

24.     Jack Weingold testified that he and David Miller entered into an agreement not to compete.

25.     Loren Margolis also testified that he and David Miller reached agreements to limit competition.

## **The Scrap Metal Civil Trial**

26.     In 2002, Plaintiff filed a class action complaint in the United States District Court for the District of Northern Ohio against Harry Rock, Bay Metal, M. Weingold, Parkwood, Bluestar, Jack Weingold, Harry Rock, Columbia National Group, CIMCO, DeMilta and others, alleging violations of the Sherman Act.  No claims were brought against David Miller individually.

8

## Tolling of the Limitations Period

27.     Throughout the Class Period, Miller and his co-conspirators fraudulently concealed their unlawful conspiracy from Plaintiff and the members of the class.  Plaintiff and other class members had no knowledge of the contract, combination or conspiracy alleged in this Complaint, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, until approximately March 2000.  At or about that time it was reported that Bay Metal had agreed to plead guilty to conspiracy with unnamed co-conspirators to rig bids and to allocate ferrous  scrap metal accounts from 1992 through 1999 in violation of 15 U.S.C. § 1.

28.      Plaintiff, in the exercise of reasonable diligence, could not have uncovered the violations set forth in this Complaint at any earlier time because the conspiracy was self-concealing and because of Defendants' efforts to conceal the unlawful activity from detection. Moreover, while Plaintiff has diligently sought to protect itself from unlawful activity, Plaintiff was unable to detect this secret activity, which by its nature is self-concealing, until it was disclosed publicly by the Government.   Accordingly, the statute of limitations is tolled and suspended with respect to any and all claims arising from the Scrap Metal Conspiracy until not earlier than March 2000.

29.     Defendants and their co-conspirators actively, intentionally, and fraudulently concealed the existence of the Scrap Metal Conspiracy from Plaintiff by the following affirmative acts, including acts in furtherance of the conspiracy:

> (a)     Secret meetings and telephone calls in which the prices, bids, and markets for scrap metal were discussed and agreed to;

> (b)     Allocating secretly among themselves sellers of scrap metal (including, among others, Plaintiff) and/or contracts for the purchase of scrap metal;

(c)  Creating a false and misleading appearance of competition for Plaintiff and/or other class members;

(d)  Instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy;

(e)  Limiting the anticompetitive, unlawful plan to a small number of people and key officials at each defendant company and misrepresenting the reasons for unlawful conduct to their own employees;

(f)  Avoiding references in documents, or the creation of documents that otherwise would be created in the ordinary course of Miller's and the co-conspirators' businesses, regarding conduct which would constitute an antitrust violation or anticompetitive act, destroying documentary proof, and/or creating code words and code names in records to disguise the activities of the conspiracy;

(g)  Participating in secret meetings and conversations to monitor and enforce adherence to the agreed-upon prices, bids and market shares;

(h)  Falsely representing to sellers that prices were fair and competitive;

(i)  Using false names;

(j)  Printing letterhead with the names of fictitious companies and using that letterhead to submit sham bids;

(k)  Concealing the common ownership of companies to create the illusion of competition;

(l)  Destroying documentary evidence of communications between conspirators; and

(m)  Committing perjury in depositions and trial testimony.

10

30.     Government proceedings tolled the statute of limitations thereafter.   These proceedings against members of the Scrap Metal Conspiracy began in 2000 and ended with the DeMilta trial in 2009.

### Class Action Allegations

31.     Plaintiff brings this action against Miller for antitrust violations on behalf of themselves and the members of the certified class [the "Class"] comprising:

> all persons or entities who sold ferrous scrap metal to Defendants and/or their co-conspirators between December 1992 and March 2000.  Excluded from the Class are Miller, his co-conspirators and their respective parents, subsidiaries and affiliates, as well as any governmental entities.

32.     This Court has previously certified this action as a class action.  Plaintiff pleads that if certification is again deemed necessary, then the factors under Rule 23 of the Federal Rules of Civil Procedure support that the case should again be certified for the following reasons:

33.     Members of the Class are so numerous that joinder is impracticable.

34.     Plaintiff's claims are typical of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct consisting in part of Miller's and his co-conspirators' illegal agreement to restrain trade, *e.g.*, they were paid artificially deflated prices for scrap metal as a result of Miller's wrongful conduct.

35.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff sold scrap metal to the conspirators and has a common and non-antagonistic interest in recovering money lost through unlawful activity and in enjoining and deterring future unlawful activity in the scrap metal trade.

36.     Plaintiff's undersigned counsel are experienced and competent in the prosecution of antitrust and other complex class action litigation.

37. Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Miller and his co-conspirators have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Miller's wrongful conduct.

38. Questions of law and fact common to the Class include:

(a) Miller's participation in the Scrap Metal Conspiracy;

(b) The existence and duration of the contract, combination and/or conspiracy alleged herein;

(c) The nature and extent of the conspiracy, including the identity of the participants in the conspiracy;

(d) Whether Defendants and their co-conspirators fraudulently concealed the conspiracy;

(e) Whether the contract, combination and/or conspiracy alleged herein constitutes a *per se* violation of the antitrust laws;

(f) If the contract, combination and/or conspiracy alleged herein does not constitute a *per se* violation, whether it violates the "Rule of Reason"; and

(g) Whether the activities of Defendants as alleged herein have substantially affected interstate commerce.

39. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that

it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

40.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

41.    Miller and his co-conspirators have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class.

## JUDGMENT EXECUTION

42.    On February 10, 2006, following a jury verdict in the *Scrap Metal* case, this Court awarded Plaintiff a judgment ("the First Judgment") against CIMCO in the amount of $23,036,000.00 plus interest at the rate of 4.67% from February 10, 2006.  That judgment is in full force and effect and has not been fully satisfied.

43.    All appeals were exhausted as of April 2, 2009, when the United States Supreme Court issued an order denying CIMCO's petition for a writ of certiorari.

44.    On September 30, 2006, in the *Scrap Metal* case, this Court awarded Plaintiff a judgment ("the Second Judgment") against CIMCO in this Court in the amount of $2,529,820.85 in attorney fees and $130,575.34 in costs, plus interest at the rate of 4.9% from September 30, 2006.  Likewise, that judgment is in full force and effect; it remains entirely unsatisfied.

45.    In 2004, CIMCO had sales revenue of $51.6 million.  Between 2000 and 2004, CIMCO maintained cash balances ranging between $2.6 and $3.4 million.  At the end of 2005, CIMCO had a cash balance of $2,557,652.  CIMCO reported total assets at the end of the 2005 tax year of nearly $7 million.  In 2005, CIMCO paid a $1,000,000 dividend to its sole shareholder, Columbia National, which is owned by David Miller.  In January 2007, CIMCO had a cash balance of $177,000 and other assets of $2,538,246.

46.     Plaintiff sought to execute the judgment by, *inter alia*, obtaining a garnishment order from the Cleveland Municipal Court and obtaining judgment liens in April and June of 2007.  Plaintiffs were able to obtain only $351,834.02 of the unpaid judgment.

47.     Plaintiff also conducted discovery in aid of execution.  Documents produced by CIMCO demonstrate that Miller, CIMCO executive Steve Ruscher, and Knox deliberately sought to avoid payment of the valid judgment by, among other things, actions designed to deplete CIMCO's assets and transfer them to Mercer and other locations beyond the reach of the Judgment.

48.     On or about May 31, 2007, the Board of Directors of CIMCO met, with Director Miller and Treasurer Steve Ruscher present, along with legal counsel.  Miller reported that CIMCO had operated successfully since the judgment in the *Scrap Metal* case.  Miller and Ruscher described Plaintiff's efforts to collect on the valid judgment owed by CIMCO as disrupting the confidence of CIMCO's scrap suppliers that they would receive payment, jeopardizing CIMCO's ability to honor its scrap sales contract obligations, and hindering CIMCO's ability to enter into new contracts.  Ruscher described Plaintiff's attempts to collect on its valid judgment as "disruptive."  Director Miller thereupon determined among other actions to suspend CIMCO's operations; to cancel CIMCO's existing commitments to customers; and to sell CIMCO's assets.  Miller undertook these steps to avoid payment of Plaintiff's valid judgment.

49.     In furtherance of the scheme to avoid payment of the judgment, CIMCO sold its equipment to Mercer, which was at that time owned and controlled by Miller and Knox, for $92,950 -- far below market value -- and sold two computers to two individuals for $350.  In July 2007, CIMCO zeroed out its balance sheet so that it had – or appeared to have – no money to satisfy this Court's judgment in the *Scrap Metal* case.

14

50.     In particular, Miller -- and through his actions, CIMCO -- set out to transfer and did transfer the assets of CIMCO to Mercer-related entities with the actual intent to hinder, delay or defraud Plaintiff in its efforts to execute on the *Scrap Metal* judgment in its favor.

51.     On or about June 1, 2007, CIMCO, through Miller, notified its customers of its determination to temporarily suspend its brokerage operations, directly in response to Plaintiff's efforts to collect on the valid judgment entered by this Court against CIMCO.  Upon information and belief, Miller transferred business opportunities and income to Mercer and other related entities without the receipt of fair consideration in return.

52.     Because of its actions immediately before, during and after this Court's entry of the First and Second Judgments, Miller, Knox, and CIMCO have frustrated Plaintiff's efforts to collect on its judgments against CIMCO.

53.     CIMCO to date has successfully and fraudulently avoided complete execution of this Court's First and Second Judgments.

## COUNT I

### Restraint of Trade: David P. Miller

54.     Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully restated herein.

55.     From a date unknown, but at least from December 1992 and continuing through March 2000, David Miller combined, conspired, and/or contracted with his competitors to restrain interstate trade and commerce in Northern Ohio and the United States, in violation of 15 U.S.C. § 1.

56.     In furtherance of the unlawful conspiracy, Miller has committed overt acts, including, *inter alia:*

(a)     Allocating scrap metal producers by agreeing to bid substantially lower than market value for contracts and/or agreeing not to bid at all;

(b)     Submitting "rigged" bids at pricing levels designed to allow a co-conspirator to "win" the business at uncompetitive prices from particular scrap metal producers;

(c)     Refraining from competition by agreement with co-conspirators;

(d)     Exchanging pricing information so that prices could be fixed and suppressed at uncompetitive levels; and

(e)     Maintaining the cartel through a pattern or practice of fines, payments, and *quid pro quo* arrangements.

57.     Working in concert with his co-conspirators in the Scrap Metal Conspiracy, Miller has restrained competition in the sale of scrap metal and injured Plaintiff and each class member in their business and property in that they have each received a lower price for their scrap metal than they would have received absent the concerted unlawful activity.

58.     The conduct of Miller and his co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

59.     In the alternative, the conduct of Miller and his co-conspirators constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, respectfully requests:

A.     That this Court certify a Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      That the unlawful combination and conspiracy alleged herein be adjudged and decreed a *per se* violation or, in the alternative, a rule of reason violation, under Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      That Plaintiff and the Class recover, jointly and severally, their damages against David Miller, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

D.      That Plaintiff and the Class be awarded their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

E.      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

F.      That this Court permanently enjoin all continuing and future unlawful activity by Defendants in violation of the antitrust laws; and

G.      That Plaintiff be awarded such additional relief as the Court may deem proper.

## COUNT II

### Fraudulent Transfer: Mercer

60.      Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully restated herein.

61.      CIMCO has transferred to Mercer assets for less than fair value and upon information and belief, transferred to Mercer income and business opportunities without compensation.

62.      The facts as alleged above constitute a fraudulent transfer under Ohio Revised Code § 1336.01 *et seq*. Plaintiff herein alleges facts falling within the various badges of fraud identified in §1336.04(B), including but not limited to the following:

17

(a)     The transfer to Mercer constituted a transfer to an insider, in light of Miller's role as president of both companies, Miller's ownership interest in Mercer and Knox's role as general manager of Columbia National and minority owner of Mercer;

(b)     CIMCO had been sued – and a judgment had been entered – before the transfer was made and, indeed, Miller determined to transfer to Mercer and others as a result of the judgment;

(c)     Substantially all assets of CIMCO were transferred in the wake of Plaintiff's initial efforts to collect on its judgment; and

(d)     The consideration received by CIMCO for the assets sold to Mercer was not reasonably equivalent to their value.

WHEREFORE, Plaintiff requests that the Court set aside the transfers to Mercer and others; attach and/or garnish all assets transferred to Mercer and others from CIMCO; appoint a receiver to take charge of the assets transferred to Mercer and others or of other property of Mercer and others; and such other and additional remedies as the Court deems just, all in the satisfaction of the First Judgment, in the amount of $23,036,000.00 plus interest at the rate of 4.67% from February 10, 2006, less any amount previously recovered from CIMCO, and the Second Judgment, in the amount of $2,660,396.19 plus interest at the rate of 4.9% from September 30, 2006.

## COUNT III

### Piercing CIMCO's Corporate Veil:  Miller

63.     Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully restated herein.

64.     The facts in this Complaint permit this Court to pierce CIMCO's corporate veil and impose liability directly on Miller.  The facts alleged above provide a basis for a finding by this Court that the control exercised by Miller over CIMCO was so complete that CIMCO had no separate mind, will or existence of its own; that Miller exercised control over CIMCO in such a manner as to commit a fraud and other unlawful acts against the Class Plaintiffs; and that injury and unjust loss to Plaintiff and other class members have resulted from such control and wrongful acts.

65.     As reflected in the minutes of CIMCO's May 31, 2007 board meeting, Miller acted in his own interest when he determined to act to temporarily dissolve CIMCO so as to frustrate efforts to collect on this Court's First and Second Judgments against it.

66.     Miller, acting on his own or together with Fred Knox or others, subordinated the interests of CIMCO to their own.  He enjoyed control over CIMCO, Columbia National, Universal Steel, CR Construction and Universal Pennsylvania, all located at the same address and operated by the same officers.  Through Columbia National, he held a controlling interest in Mercer, which shared officers with these entities.  He used his control over these entities to act to hide the assets of CIMCO and to transfer the assets of CIMCO to other entities under his own control, all in an effort to avoid this Court's First and Second Judgments.

67.     In consequence, Plaintiff is entitled to pierce the corporate veil that ordinarily would insulate Miller from CIMCO's actions and liabilities, and seek the full measure of Plaintiff's Judgments against CIMCO from Miller individually.

WHEREFORE, Plaintiff requests that this Court pierce CIMCO's corporate veil so as to permit access to the assets of Miller, in his individual capacity, and enter judgment, all in satisfaction of the First Judgment, in the amount of $23,036,000.00 plus interest at the rate of 4.67% from February 10, 2006, less any amount previously recovered from CIMCO, and the

Second Judgment, in the amount of $2,660,396.19 plus interest at the rate of 4.9% from September 30, 2006.

## COUNT IV

### Unjust Enrichment: Miller and Mercer

68.     Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully restated herein.

69.     Class Plaintiffs holds valid judgments:  this Court's First Judgment and Second Judgment, in the *Scrap Metal* litigation, against CIMCO.

70.      Class Plaintiff unintentionally conferred a benefit on Miller, Mercer and other entities under Miller's control in that money and assets owed to Class Plaintiffs under the judgments in the Scrap Metal Litigation have been transferred to Miller, Mercer and others.

71.     Under these circumstances, it would be unjust to allow Miller, Mercer and other persons and entities under their control to retain the assets and money owed by CIMCO to Class Plaintiff.

72.     Miller and Mercer should be required to disgorge all money and other assets transferred from CIMCO so as to satisfy this Court's First Judgment and Second Judgment.

WHEREFORE, Plaintiff requests that this Court find that Miller and Mercer have been unjustly enriched by their retention of sums owed to Plaintiff pursuant to this Court's First Judgment and Second Judgment; and that this Court enter judgment against Mercer and Miller in their capacities, all in satisfaction of the First Judgment, in the amount of $23,036,000.00 plus interest at the rate of 4.67% from February 10, 2006, less any amount previously recovered from CIMCO, and the Second Judgment, in the amount of $2,660,396.19 plus interest at the rate of 4.9% from September 30, 2006.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

DATED:  January 26, 2010

s/Walter W. Noss
Walter W. Noss (0072784)
Email:  wnoss@scott-scott.com
**SCOTT+SCOTT LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH  44106
Telephone:  (216) 229-6088
Facsimile:  (216) 229-6092

Edmund W. Searby (0067455)
E-mail:  esearby@mcdonaldhopkins.com
Anne Owings Ford (0043717)
E-mail:  aoford@mcdonaldhopkins.com
**MCDONALD HOPKINS LLC**
600 Superior Avenue East, Suite 2100
Cleveland, OH  44114
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474

William A. Isaacson (DC 414788)
E-mail:  wisaacson@bsfllp.com
Tanya S. Chutkan (DC 420478)
E-mail:  tchutkan@bsfllp.com
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC  20015
Telephone:  202-237-2727
Facsimile:  202-237-6131

*Attorneys for Plaintiff*
*The Lincoln Electric Company*